Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>v.<br><br><br>ANDRÉS SANTIAGO OYOLA<br><br>Apelante | KLAN202400848 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.:<br>E EC2024G0001<br><br>Sobre:<br>Art. 127.C C.P.<br>Grave (2012) |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de julio de 2025.

Comparece ante esta Curia, por derecho propio y de forma *pauperis,*[1] el señor Andrés Santiago Oyola (señor Santiago Oyola o Apelante). Implora en su recurso que revoquemos un dictamen que emitió el Tribunal de Primera Instancia, Sala Superior de Caguas (TPI o foro primario), mediante el cual, lo condenó a dos (2) años de prisión por cometer el delito de explotación financiera en contra de la señora Rosa Ivette Aponte Rodríguez (señora Aponte Rodríguez), persona de edad avanzada.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado.

**I.**

Por hechos acaecidos el 10 de junio de 2022,[2] el Ministerio Público presentó una acusación en contra del señor Santiago Oyola

---

[1] Mediante una *Resolución,* emitida el 30 de octubre de 2024, declaramos Ha Lugar la *Solicitud y Declaración para que se exima de pago de arancel por razón de indigencia* que instó el señor Santiago Oyola, por lo cual, se le eximió de cancelar los aranceles correspondientes.

[2] Cabe señalar que, surge de la acusación que los hechos objeto de este pleito ocurrieron el 16 de junio de 2022. Sin embargo, la señora Aponte Rodríguez aclaró durante el contrainterrogatorio que, acudió al banco a realizar el retiro el 10 de

por infringir el Artículo 127-C del Código Penal de Puerto Rico de 2012 (explotación financiera a personas de edad avanzada), Ley Núm. 146-2012, 33 LPRA sec. 5186c. Durante el juicio por tribunal de derecho,[3] el Ministerio Público presentó los siguientes documentos estipulados por las partes: *Exhibit* 1-Certificado de nacimiento de la señora Rosa Ivette Aponte Rodríguez; *Exhibit* 2-Mensajes a través de *WhatsApp*; *Exhibit* 3-Advertencias Miranda; *Exhibit* 4-orden o *subpoena* dirigida al Banco Popular de Puerto Rico en solicitud de información relacionada al retiro de $80,000.00, realizado el 16 de junio de 2022, contra la cuenta #785200022; *Exhibit* 5-Informe de incidentes (PPR 621.2), fechado el 13 de diciembre de 2023.[4] Por su parte, la defensa presentó como prueba documental otro Informe de incidentes (PPR 621.1), con fecha de 8 de junio de 2023, identificado como *Exhibit* 1 de la defensa, sin objeción del Ministerio Público.[5] Como prueba oral, el Ministerio Público presentó los testimonios de la señora Aponte Rodríguez y del Agente Ángel Ramos Torres (Agente Ramos Torres), los cuales resumimos a continuación.

### Señora Aponte Rodríguez:

Comenzó su testimonio expresando que nació, el 26 de diciembre de 1959, en el Bronx, Nueva York.[6] Declaró que conoció al señor Santiago Oyola un sábado durante el mes de marzo de 2022, mientras almorzaba con su hija en un *food truck* llamado Emma's Pizza, cuando este se les acercó y preguntó si se podía sentar en la misma mesa que ellas, a lo cual accedieron.[7] A su vez relató que, sostuvieron una conversación sobre su interés de vender

---

junio de 2022 aunque dicha transacción se reflejó en su estado de cuenta el 16 de junio de 2022. Transcripción de la Prueba Oral (TPO), pág. 53, líneas 23-30.

[3] El juicio se celebró el 9 de abril de 2024, y los días 14, 17 y 20 de mayo de 2024.

[4] TPO, pág. 86, línea 30.

[5] *Íd.*, pág. 96, línea 30.

[6] *Íd.*, pág. 13, líneas 6-25. A esos efectos, y por estipulación, el certificado de nacimiento se marcó como *Exhibit* 1.

[7] *Íd.*, pág. 14, líneas 19-31; pág. 15, líneas 1-5.

una guagua marca Honda modelo Pilot, luego de que el señor Santiago Oyola les comentó que se dedicaba a la compra y venta de vehículos.[8] Añadió que, mantuvieron comunicación a diario por *WhatsApp* o personalmente porque comenzó a visitarla.[9] Sostuvo que, luego de que el señor Santiago Oyola la ayudó a vender su guagua, comenzaron una relación consensual para mayo del año 2022.[10] Detalló que, el señor Santiago Oyola le ofreció una relación seria, seguridad y estabilidad,[11] durante los cuatro (4) meses que mantuvieron su relación.[12] Atestó que, el señor Santiago Oyola le ofreció matrimonio y una casa bella, de lo cual se convenció que era real por su trato hacia ella, el cual describió como: "siempre estaba bien pendiente [...] a mis hijos y a mí, siempre estaba preguntándome cómo estaba, qué necesitaba, qué podía hacer por mí, en qué forma podía ayudarme. Siempre me decía que cada día más se enamoraba de mí, que yo era su princesa, que mis hijos iban a ser sus hijos...que todo lo que tenía iba a ser mío, e...que íbamos a levantar un hogar juntos."[13]

A preguntas del Ministerio Público expresó que, cada vez que hablaban sobre los planes del futuro, el señor Santiago Oyola le preguntaba si contaba con dinero guardado para comprar otra guagua y para planificar el matrimonio.[14] Narró que, el 16 de junio de 2022, fue al Banco Popular con el señor Santiago Oyola a retirar $80,000.00.[15] Añadió que, el señor Santiago Oyola le representó que podía invertir y triplicar ese dinero porque "pertenecía a una sociedad de personas de cuello blanco, policías, gente del gobierno, etc. [. . .] que se dedicaban a la compra y venta de autos, etc. pero

---

[8] *Íd.*, pág. 15, líneas 12-16.
[9] *Íd.*, pág. 15, líneas 26-31.
[10] *Íd.*, pág. 19, líneas 28-31.
[11] *Íd.*, pág. 17, líneas 6-13.
[12] *Íd.*, pág. 19, línea 4.
[13] *Íd.*, pág. 20, líneas 8-10; pág. 21, líneas 10-15.
[14] *Íd.*, pág. 23, líneas 8-12, 22-24.
[15] *Íd.*, págs. 23 y 24, líneas 30 y 14, 15 y 20.

que nadie podía entrar ni salir. Pero que como él era socio, él podía [. . .] meter el dinero a esa sociedad y tripicarlo".[16]

Agregó que, previo a efectuar el retiro, continuaba con dudas de si debía hacerlo porque dentro de esa cantidad había $35,000.00 del préstamo estudiantil de su hija.[17] Detalló que, el señor Santiago Oyola le prometió que con ese dinero, su hija no tendría que volver a coger otro préstamo estudiantil, su hijo podría comprar una casa y estos podrían construir la casa que este le había mostrado por *WhatsApp*.[18] Atestó que, la noche antes de ir al banco, el señor Santiago Oyola la convenció de retirar el dinero cuando le dijo, de manera insistente, que la mesa de su casa estaba verde, debido a que todos ya habían dado el dinero, que solo faltaba ella y que si no invertía su dinero se quedaría fuera del negocio.[19] Informó que, el señor Santiago Oyola le mencionó que pondría $20,000.00 para que la cantidad aumentara a $100,000.00 de manera que la ganancia fuera más.[20] Añadió que, el señor Santiago Oyola volvió a insistirle que invirtiera y le dijo que pensara en sus hijos y en todo lo que ellos no tendrán que pagar.[21] Sostuvo que sintió miedo, que se sintió presionada y, como resultado, le dijo que pasara por ella al día siguiente para ir a retirar el dinero.[22]

Continuó relatando que, al otro día, el señor Santiago Oyola llegó a la casa a recogerla y le dijo que vaciara la cartera y se llevara solamente su identificación.[23] Añadió que, a su llegada al banco, estaba bien nerviosa, en duda de si lo estaba haciendo bien o mal, y expresó no haber consultado lo antes con su hija para darle la sorpresa.[24] Testificó que, al entregar la hoja de retiro a la "teller",

---

[16] *Íd.*, pág. 24, líneas 23-31.
[17] *Íd.*, pág. 25, en las líneas 19-20.
[18] *Íd.*, pág. 26, en las líneas 17-21.
[19] *Íd.*, pág. 26, líneas 29-31 y pág. 27, líneas 1-4.
[20] *Íd.*, pág. 27, líneas 6-13.
[21] *Íd.*, pág. 27, líneas 8-10.
[22] *Íd.*, pág. 27, líneas 15-16.
[23] *Íd.*, pág. 27, líneas 18-21.
[24] *Íd.*, pág. 28, líneas 1-4.

esta le preguntó si estaba segura de la cantidad a retirar, a lo cual se mantuvo completamente callada, temblando de arriba abajo, y es el señor Santiago Oyola quien contesta que sí.[25]

Declaró que la "teller" buscó al gerente del banco quien le preguntó si estaba segura de que esa era la cantidad que deseaba retirar y que el señor Santiago Oyola respondió que sí.[26] Relató que, a preguntas del gerente, el señor Santiago Oyola contestó que el dinero era para un negocio de compra y venta de vehículos y que lo deseaba en denominaciones de 20, no en cheque de gerente.[27] Añadió que, antes de entregarles el dinero, la "teller" le pidió la identificación a ambos, lo cual el señor Santiago Oyola cuestionó.[28]

Indicó que, recibido el dinero, lo colocó dentro de su cartera, la cual el señor Santiago Oyola procuró que estuviera totalmente vacía, y se dirigieron hasta su apartamento.[29] Narró que, vaciaron el dinero sobre su mesa y el señor Santiago Oyola volvió a explicarle el negoció, que él entregará el dinero en la sociedad para que se vuelva a duplicar o triplicar, colocaron el dinero en dos (2) bolsas de compra del supermercado y se retiró.[30]

Narró que, durante esa semana, sostuvieron comunicaciones constantes pero que, al preguntarle sobre el negocio él le respondía que no podía decir nada.[31] Explicó que, comenzaron a distanciarse luego de entregarle el dinero hasta que la relación entre ellos terminó el último domingo de junio.[32] Detalló que invitó al señor Santiago Oyola a su casa a almorzar y es cuando ella le dijo a él que no podía crecer el amor entre ellos, que había una bonita amistad que deseaba conservar y que interesaba continuar con el negocio.[33] A

---

[25] *Íd.*, pág. 28, líneas 24-27.
[26] *Íd.*, pág. 28, líneas 29-31.
[27] *Íd.*, pág. 29, líneas 1-5 y 10-13.
[28] *Íd.*, pág. 29, líneas 23-27.
[29] *Íd.*, pág. 30, líneas 1-17.
[30] *Íd.*, pág. 30, líneas 23-28.
[31] *Íd.*, pág. 31, líneas 10-16.
[32] *Íd.*, pág. 31, líneas 17-29.
[33] *Íd.*, pág. 32, líneas 22-29.

preguntas sobre cómo el señor Santiago Oyola reaccionó, la señora Aponte Rodríguez atestó que, se puso bien agresivo, me dijo "puta" y que no me iba a entregar un solo centavo porque yo lo quería para usarlo con otro macho.[34] Abundó que, ella expresó que no se iba a dejar humillar ni manipular y que, luego de alzar la voz, la discusión terminó porque él le pidió a la hija de ella que la calmara y luego de eso se desapareció.[35]

A preguntas sobre qué gestiones realizó -luego de la discusión- para conocer sobre el estatus del dinero declaró que, ella y su hija comenzaron a llamar al señor Santiago Oyola quien no respondía.[36] Detalló que, además de las llamadas, también fue varias veces en semana a donde vivía el señor Santiago Oyola, en la Carretera 172 hacia el Municipio de Cidra, pero que casi nunca lo conseguía.[37] Informó que, luego de casi un año detrás de él, el 13 de enero de 2023, fue por última vez a la residencia del señor Santiago Oyola a las 11:30 de la noche porque no lo conseguía de día.[38] Añadió que, tocó a la puerta y como no abrió, decidió cruzar el balcón e irse por el alero, aunque era un apartamento en un tercer piso.[39] Detalló que, tocó la ventana de la cocina y, a petición suya, el señor Santiago Oyola abrió la puerta, le pidió que se fuera, que no quería problemas, que tenía visitas, que pasaría por su casa.[40]

Narró que, al día siguiente, el señor Santiago Oyola la llamó por teléfono pero que ella no podía hablar con él porque su hermana estaba en la casa y su familia no sabía sobre esa situación.[41] Atestó que, durante la llamada, él comentó que posiblemente se comunicaba con ella el miércoles si no lo dejaban preso y que no

---

[34] *Íd.*, pág. 32, líneas 22-30; pág. 33, líneas 1-6.
[35] *Íd.*, pág. 33, líneas 7-8, 18-22.
[36] *Íd.*, pág. 33, líneas 25-28.
[37] *Íd.*, pág. 34, líneas 29-31 y pág. 36, líneas 24-24.
[38] *Íd.*, pág. 36, líneas 30-31 y pág. 37, líneas 1-3.
[39] *Íd.*, pág. 37, líneas 5-7.
[40] *Íd.*, pág. 37, líneas 17-26.
[41] *Íd.*, pág. 37, líneas 28-31.

volviera a contactar a ningún familiar de él.[42] Lo antes, en respuesta a que, en los meses que la señora Aponte Rodríguez no conseguía al señor Santiago Oyola, ella se comunicó con un familiar de él que vive donde ella reside.[43] Informó que, el 16 de enero de 2023, regresó a donde vivía el señor Santiago Oyola pero él se había mudado.[44]

Afirmó que, el señor Santiago Oyola fue una vez a su casa, en agosto, y que le dijo que no sabía nada del dinero.[45] Testificó que, en octubre del año 2022, el señor Santiago Oyola la bloqueó a ella y a su hija de *WhatsApp* y de todos los medios.[46] Abundó que, al día de hoy no sabe nada de su dinero.[47] Finalmente, las partes estipularon como *Exhibit* 2, cuatro (4) páginas de mensajes de *WhatsApp* que intercambiaron la señora Aponte Rodríguez y el señor Santiago Oyola, entre el 15 de septiembre y el 30 de septiembre de 2022, a algunos de los cuales, a solicitud del Ministerio Público, la señora Aponte Rodríguez dio lectura durante el juicio.[48] A modo ilustrativo transcribimos el mensaje con fecha de envío del 29 de septiembre de 2022:

> Andy, sé q Jarice, bajo su desconsuelo y desesperación, al igual q yo, por la situación de la rotación en Arizona, ya q se acerca el día d pago !!! t escribió..como tambn me enseñ[ó] tu escueta, insensible e inmadura respuesta, hacia ella, quién siempre t demostró afect[o], cariño y confianza, al grado d pensar q al escribirte iba obtener una respuesta sincera y honesta, creyendo q eres una persona madura q sabe dividir lo personal de los negocios...Y NO vengas q no sabes d lo q hablo pq bien lo sabes!!!! En todo este tiempo lo único q t he pedido es 'COMUNICACIÓN', algo q es tu deber cuando se hacen tratos o negocios... eres tú, al no contestar mis llama[d]as, el q me obliga a escribirte... Pides respeto, APRENDE...el RESPETO empi[ez]a por la casa!!!! Dices q como Padre harías lo q fuera por tus hijas, pues t encontraste con una peor !!!! Ya han pasado 4 meses y t niegas a hablar conmigo con tus excusas baratas d falta de confianza !!!!!! Pues t diré q quién no cree soy yo!!! Ahora más q nunca, creo q todo fué [sic] una MENTIRA para ver si caía en tu engaño y por tus

---

[42] *Íd.*, pág. 38, líneas 1-5.
[43] *Íd.*, pág. 38, líneas 6-10.
[44] *Íd.*, pág. 42, líneas 4-5.
[45] *Íd.*, pág. 39, líneas 1-2, 6-8, pág. 40 línea 4.
[46] *Íd.*, pág. 40, líneas 10-14, pág. 43 líneas 28-31.
[47] *Íd.*, pág. 42, líneas 23-24.
[48] *Íd.*, pág. 45, líneas 6-13; pág. 46, líneas 4-10 y 24-31; pág. 47, líneas 1-15.

promesas y trato, caí facilito!!!! T entregué todos los ahorros d mí [sic] hija y míos creyendo en tus palabras y me [sic] tristemente me doy cuenta que me ESTAFASTE!!! Quiero saber qué pasó con Mis 80,000 dólares ? ? ?

Durante el contrainterrogatorio, la señora Aponte Rodríguez afirmó que, durante el juicio, es cuando por primera vez informó que el señor Santiago Oyola le preguntaba en cada oportunidad por sus ahorros.[49] Relató que, no entendía que era ilegal la actividad en la que estaba involucrado el señor Santiago Oyola, por tanto, nunca tuvo sospecha de la secretividad.[50] Aclaró que, la fecha del retiro de dinero en el banco fue el día 10 de junio de 2022 y que ninguna de las personas que la atendieron en el banco le preguntaron si se encontraba bien.[51] Admitió que, además de enviar al señor Santiago Oyola mensajes vía *WhatsApp*, lo llamaba más de 30 veces al día y llegaba a su casa de sorpresa, durante varios meses.[52] Reconoció que, cuando fue a la casa del señor Santiago Oyola, en enero de 2023, iba mentalizada a hacer lo que fuera para encontrarlo, incluso a escalar.[53] Aceptó, además, que de los mensajes leídos durante el juicio solo uno hacía referencia a los $80,000.00, y que para la fecha de su envío ya el señor Santiago Oyola la había bloqueado.[54]

Durante el re directo, a preguntas sobre si la transacción fue el 10 ó 16 de junio, la señora Aponte Rodríguez explicó que su estado de cuenta bancario reflejó que el retiro se hizo el 16 de junio.[55] Al cuestionársele por qué seguía buscando al señor Santiago Oyola luego de estar separados, la señora Aponte Rodríguez expresó que era para saber dónde estaba su dinero y que no lo dejaba de buscar debido a que él no le contestaba.[56]

---

[49] *Íd.*, pág. 49, líneas 13-18.
[50] *Íd.*, pág. 52, líneas 13-18.
[51] *Íd.*, pág. 53, líneas 28-30; pág. 57; en las líneas 1-8.
[52] *Íd.*, pág. 68, líneas 4-11.
[53] *Íd.*, pág. 69, líneas 4-12.
[54] *Íd.*, pág. 76, líneas 21-31; pág. 77 línea 1.
[55] *Íd.*, pág. 77, líneas 19-22.
[56] *Íd.*, pág. 77, líneas 11-14.

**Agente Ramos Torres**

A preguntas del Ministerio Público, el Agente Ramos Torres señaló que la querella de este caso la hizo la señora Aponte Rodríguez durante el mes de enero de 2023.[57] Declaró que, la señora Aponte Rodríguez manifestó en la querella que su pareja le había hecho un fraude de $80,000.00.[58] Además, que la señora Aponte Rodríguez le informó que tuvo una relación consensual o de noviazgo con el señor Santiago Oyola.[59] Puntualizó que, la señora Aponte Rodríguez le indicó que el señor Santiago Oyola le ofreció invertir sus ahorros en un negocio de compra y venta de autos, que le duplicaría esa cantidad y que como le tenía confianza le dijo que sí.[60] Agregó que, la señora Aponte Rodríguez le relató que en el mes de junio fue junto al señor Santiago Oyola al Banco Popular de Plaza Centro en Caguas a retirar los $80,000.00 de su cuenta de ahorro y que, una vez llegan a su residencia en Gurabo, entregó el dinero al señor Santiago Oyola en una bolsa como de basura.[61]

El Agente Ramos Torres testificó que, la señora Aponte Rodríguez le informó que, días después de entregar el dinero al señor Santiago Oyola, este fue cambiando su manera de ser con ella, que ya no le contestaba, que todo le molestaba, y que en septiembre ella decide terminar la relación.[62]

El Agente Ramos Torres continuó narrando que citó al señor Santiago Oyola para entrevistarlo sobre una alegada querella de fraude.[63] Testificó que, al preguntarle dónde trabaja, el señor Santiago Oyola respondió que no trabaja, que recibe seguro social, que está incapacitado.[64] Añadió que, luego de hacerle las

---

[57] *Íd.*, pág. 80, líneas 22-24.
[58] *Íd.*, pág. 80, líneas 28-31.
[59] *Íd.*, pág. 81, líneas 3-6.
[60] *Íd.*, pág. 81, líneas 15-22.
[61] *Íd.* pág. 80, líneas 22-26.
[62] *Íd.*, pág. 82, líneas 11-15.
[63] *Íd.*, 84, líneas 16-18.
[64] *Íd.*, pág. 84, líneas 8-9.

advertencias de ley, el señor Santiago Oyola las firmó e indicó que no iba a hacer declaraciones sobre los hechos de la querella.[65]

Cuestionado sobre qué hizo posteriormente, el Agente Ramos Torres explicó que obtuvo una orden de *subpoena* contra el Banco Popular, producto de lo cual, corroboró que de la cuenta de la señora Aponte Rodríguez se retiraron $80,000.00, el 16 de junio de 2022.[66] Manifestó que, solicitó al Banco Popular el Formulario 112, que llenan los bancos cuando personas de edad avanzada hacen retiros de sumas irregulares.[67]

En cuanto a las medidas de seguridad existentes en el complejo en donde vivía la señora Aponte Rodríguez narró que, cuando él fue, de su recuerdo en horas de la tarde, no había guardia de seguridad sino un *intercom* a través del cual tuvo que llamar a un número.[68] Agregó que el complejo tiene cámaras de seguridad pero que no pudo obtener los vídeos porque habían pasado más de seis (6) meses desde los hechos y las imágenes se borran del sistema.[69] El Agente Ramos Torres declaró que entrevistó, además, al gerente del Banco Popular y a la empleada de seguridad del complejo en donde residía la señora Aponte Rodríguez.[70] Ahora bien, debido a que estos no fueron llamados como testigos, no se le permitió al agente hablar sobre lo discutido entre ellos.[71]

Durante su contrainterrogatorio, el Agente Ramos Torres expresó que no entrevistó a la hija de la señora Aponte Rodríguez, aunque sí a un tío del señor Santiago Oyola.[72] Detalló que, fue a la residencia del señor Santiago Oyola entre enero y febrero, pero este último ya no vivía allí.[73] Aseveró desconocer en qué nivel de dicha

---

[65] *Íd.*, pág. 85, líneas 5-8.
[66] *Íd.*, pág. 85 líneas 11-12 y pág. 86, líneas 12-18.
[67] *Íd.*, pág. 87, líneas 4-6.
[68] *Íd.*, pág. 88, líneas 25-28.
[69] *Íd.*, pág. 89, líneas 5-9.
[70] *Íd.*, pág. 89, líneas 10-15.
[71] *Íd.*, pág. 89, líneas 10
[72] *Íd.*, pág. 92, líneas 6-7 y 27.
[73] *Íd.*, pág. 92, líneas 16-22.

propiedad vivía el señor Santiago Oyola y que la señora Aponte Rodríguez se había trepado y caminado por el alero de esta.[74]

Informó que la entrevista inicial con la señora Aponte Rodríguez duró aproximadamente 15 minutos, que no verificó su celular ni leyó los mensajes entre ella y el señor Santiago Oyola, aunque ella se los mostró.[75] Admitió que dio por cierto los datos que el señor Santiago Oyola le indicó en cuanto a que no trabaja y que recibe los beneficios del seguro social, sin verificarlos.[76] Además, dio lectura al Informe de incidentes, marcado como *Exhibit* 1 de la defensa, en el que hizo constar que, luego de consultar el caso con la fiscal, esta determinó que lo que procedía en ese momento era una acción civil.[77]

A preguntas del Ministerio Público durante el re directo, el Agente Ramos Torres declaró que, después de redactar el informe admitido como *Exhibit 1* de la defensa, hubo varias reuniones en fiscalía y, el 13 de diciembre de 2023, redactó otro informe, identificado como *Exhibit 5* estipulado que contiene una nota que lee de la siguiente manera:

> se informa que el fiscal Francisco González radicó artículo 127-A del Código Penal y artículo 3.1 ley 54 en ausencia por...en ausencia a la persona antes mencionada. La Honorable juez María Rojas encontró causa fijando 300 mil de fianza y una orden de protección a la víctima y orden de arresto contra Andrés Santiago Oyola.[78]

En reacción a unas preguntas del Tribunal, el Agente Ramos Torres expresó haber corroborado que el señor Santiago Oyola no tenía un negocio a su nombre antes de hacerle las advertencias, a las cuales no renunció.[79]

Así las cosas, el 31 de julio de 2024, el TPI dictó la *Sentencia* apelada y declaró culpable al señor Santiago Oyola del delito

---

[74] *Íd.*, pág. 93, líneas 4-17.
[75] *Íd.*, pág. 94, líneas 4-19.
[76] *Íd.*, pág. 96, líneas 16-24.
[77] TPO, págs. 97-98, líneas 30-31 y 1-2.
[78] *Íd.*, pág. 101, líneas 23-26; pág. 102, líneas 1-12.
[79] *Íd.*, pág. 107, líneas 17-24; pág. 108, líneas 2-21.

descrito en el Artículo 127-C del Código Penal, *supra.* De esta forma, lo condenó a una pena de cárcel por dos (2) años y a una pena de restitución de $80,000.00.[80]

Inconforme con lo anterior, el señor Santiago Oyola acude ante nos mediante el presente recurso en el cual señala la comisión de cuatro errores, a saber:

> Erró el Tribunal de Instancia al admitir prueba inadmisible impertinente no confiable e inflamatoria contra el apelante, convi[cc]iones erradas.

> El Tribunal de Instancia al no brindar la Regla 95 de [P]rocedimiento [C]riminal, 34 LPRA Ap. II R. 95[,] descubrimiento de prueba [M]inisterio [F]iscal en favor del apelante.

> En su apreciación de la prueba al concederle credibilidad a los [t]estigo[s] de carg[o] [a pesar] de las m[ú]ltiples contradic[c]iones[,] omisiones y falsedades en sus testimonios.

> Al encontrar culpable al apelante [a pesar] de que el estado no prob[ó] su culpabilidad más all[á] de toda duda razonable.

Tras concederle un término a esos efectos, el Apelante remitió ante esta Curia una copia del dictamen impugnado, suscrita el 10 de octubre de 2024. En cumplimiento con nuestra *Resolución,* notificada el 12 de junio de 2025, el Ministerio Público comparece mediante el *Alegato [del] Pueblo de Puerto Rico.* Con respecto a los primeros dos señalamientos de error imputados, el Estado argumenta que el Apelante no discutió cuál fue la presunta prueba inadmisible que presentó el Estado en su contra, ni cuál fue la evidencia que el Ministerio Público no puso a su disposición, lo cual le impide a esta Curia considerarlos.

En cuanto al tercer y cuarto error consignado, el Ministerio Público en su escrito destaca que, descargó su obligación de probar el delito imputado más allá de duda razonable. A esos efectos, resume la prueba de cargo la cual asegura que fue suficiente para

---

[80] Apéndice del Recurso, Anejo 3, pág. 3.

establecer que el señor Santiago Oyola se valió de engaños y falsas pretensiones para lograr que la señora Aponte Rodríguez le entregara ochenta mil dólares para un negocio inexistente.

Con el beneficio de los alegatos de ambas partes, los autos originales, así como, la transcripción de la prueba oral, resolvemos.

**II.**

**A. Apreciación de la prueba y estándar de revisión judicial**

Como regla general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los foros inferiores, sin intervenir con la apreciación y con la adjudicación de credibilidad que realiza el juzgador de los hechos en cuanto a la prueba testifical. *Pueblo v. Negrón Ramírez,* 213 DPR 895 (2024). Ello, debido a que, "[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778-779 (2022), citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). Después de todo, es el juzgador de los hechos o el jurado quien escucha la prueba testifical y evalúa el comportamiento de los declarantes. *Pueblo v. Negrón Ramírez,* supra.

De conformidad, el Tribunal Supremo de Puerto Rico ha resuelto que, los tribunales apelativos intervienen con la apreciación de la prueba cuando: (1) el apelante demuestra la existencia de pasión, prejuicio, parcialidad o error manifiesto; o (2) si la apreciación de la prueba no concuerda con la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Negrón Ramírez,* supra. A esos efectos, la parte que impugne la apreciación de la prueba es la parte encargada de señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán Torres,* 117 DPR 645 (1986).

Cabe señalar que, toda persona acusada dentro de un proceso criminal goza de una presunción de inocencia, de rango constitucional, codificada en el Artículo II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo I; *Pueblo v. Negrón Ramírez, supra.* Dicha presunción emana de las Reglas 110 y 304 de Evidencia, 32 LPRA Ap. VI, R.110 y 304, y exige al Estado demostrar con prueba la culpabilidad del acusado más allá de duda razonable. *Pueblo v. Negrón Ramírez, supra*; *Pueblo v. Colón González,* 209 DPR 967, 977 (2022). A tales efectos, el Estado deberá presentar prueba sobre los elementos del delito y la conexión de la persona acusada con el delito. *Íd.* Ante la existencia de duda razonable acerca de la culpabilidad del acusado, el juzgador de los hechos debe absolverlo. Regla 110 de Procedimiento Criminal, *supra*; *Pueblo v. Santiago et al.*, 176 DPR 133, 142 (2009).

Lo anterior no significa que el Estado tenga que destruir toda duda posible, especulativa o imaginaria a los fines de probar la culpabilidad de la persona acusada con certeza matemática. *Pueblo v. Negrón Ramírez, supra*; *Pueblo v. Casillas, Torres,* 190 DPR 398, 414 (2014). El Estado debe presentar prueba suficiente que establezca en el juzgador de los hechos "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no provenido". *Íd.* págs. 414-415.

Asimismo, la Regla 110 de Evidencia, *supra*, prescribe, en lo pertinente, lo siguiente:

> La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:
>
> [. . .]
>
> (c) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza.
>
> (d) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.

[. . .]

(h) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquellas que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

Conforme a lo anterior, el testimonio de un solo testigo que le merezca entera credibilidad al juzgador de hechos, es prueba suficiente para demostrar la culpabilidad de un acusado más allá de duda razonable y derrotar, así, la presunción de inocencia. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 476 (2013). Véase, además, *Pueblo v. Chévere Heredia*, 139 DPR 1, 15 (1995). De igual forma, la prueba circunstancial, esta es, aquella que se basa en una inferencia razonable, es tan suficiente como la prueba directa para probar cualquier hecho adjudicativo, incluso, en casos penales. *Acarón et al. v. D.R.N.A.*, 186 DPR 564, 589 (2012); *Pueblo v. Pagán Ortiz*, 130 DPR 470 (1992).

En *Pueblo v. Cabán Torres*, supra, se resolvió que no existe el "testimonio perfecto". Este, de ordinario, en lugar de ser indicativo de veracidad, es altamente sospechoso porque, por lo general, es producto de la fabricación. *Íd.* Por tanto, evaluar un argumento sobre inconsistencias y contradicciones en la prueba testifical, plantea "una de las situaciones más delicadas, difíciles y angustiosas con las que se confrontan los componentes de un tribunal apelativo en su diaria labor". *Íd.* pág. 653. En ese sentido, los conflictos de un testimonio son dirimidos por el jurado o por el tribunal de derecho, y solo procede alterar el valor, la credibilidad y la determinación ante la demostración de circunstancias extraordinarias. *Pueblo v. Torres Rivera*, 137 DPR 630, 640 (1994).

Ante un planteamiento sobre insuficiencia de prueba, la función revisora apelativa "consiste en evaluar si la evidencia

admitida cumplió con el estándar probatorio de establecer la culpabilidad del acusado más allá de duda razonable". *Pueblo v. Negrón Ramírez, supra.* Ahora bien, cuando el reclamo es atinente a la apreciación de la prueba, lo que se impugna es la valorización, la credibilidad o el aquilatamiento que el juzgador de los hechos adjudicó a la prueba desfilada durante el juicio. *Íd.*

Es norma reiterada que los tribunales apelativos no intervienen, de ordinario, con la apreciación y con la adjudicación de credibilidad realizada por el Tribunal de Primera Instancia, en relación con la prueba testifical. *Pueblo v. Hernández Doble,* 210 DPR 850, 864-865 (2022). Como se sabe, la parte apelante es la llamada a señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán Torres, supra,* pág. 648. En ausencia de una valoración apasionada, prejuiciada, parcializada o manifiestamente errónea, los foros apelativos deben abstenerse de intervenir con la apreciación de la prueba y la credibilidad adjudicada por el juzgador de los hechos. *Pueblo v. Arlequín Vélez,* 204 DPR 117, 147 (2020).

La apreciación de la prueba desfilada en un juicio criminal es un asunto combinado de hecho y derecho, y, por tanto, se puede revisar en apelación la controversia en torno a si el Estado probó la culpabilidad del acusado más allá de duda razonable. *Pueblo v. Negrón Ramírez, supra.* En su consecuencia, puede existir una excepción a la doctrina de abstención si, al analizar integralmente la prueba testifical, se produce en el ánimo del foro apelativo "una insatisfacción o intranquilidad de conciencia tal que se estremezca su sentido básico de justicia". *Pueblo v. Arlequín Vélez,* supra, pág. 148.

**B. Prueba pertinente y admisible**

En nuestra jurisdicción, las Reglas 401 y 402 de las Reglas de Evidencia regulan la admisibilidad y pertinencia de la prueba, 32 LPRA Ap. VI, R. 401-402. En particular, la Regla 401, *supra,* define

evidencia pertinente como "aquélla que tiende a hacer la existencia de un hecho, que tiene consecuencias para la adjudicación de la acción, más probable o menos probable de lo que sería sin tal evidencia. Esto incluye la evidencia que sirva para impugnar o sostener la credibilidad de una persona testigo o declarante".

Con respecto a la relación entre pertinencia y admisibilidad, la Regla 402, *supra,* establece que, de ordinario, la evidencia pertinente es también admisible, salvo que -por imperativo constitucional, por ley o por las propias Reglas de Evidencia- se disponga lo contrario. *Pueblo v. Otero Robles*, 206 DPR 771, 779 (2021). La citada regla decreta, además, que "[l]a evidencia no pertinente es inadmisible." Así, el requisito de pertinencia como condición para la admisibilidad de evidencia solo implica cierto grado mínimo de valor probatorio o inferencial. Por ello, cuando la evidencia es pertinente y no existe una regla de exclusión aplicable, la balanza debe inclinarse a favor de su admisión. Excluir evidencia pertinente sin razones de peso que lo justifique equivale a un abuso de discreción por parte del tribunal. E. Chiesa Aponte, *Tratado de Derecho Probatorio*, Publicaciones J.T.S., Tomo I, a las págs. 8-9.

### C. Explotación financiera de personas de edad avanzada

El Artículo 127-C del Código Penal de Puerto Rico, *supra,* regula lo concerniente a la explotación financiera de personas de edad avanzada[81] y, en lo pertinente, dispone:

(a) *Modalidades*

(1) El uso impropio de fondos, propiedad mueble o inmueble o de los recursos de una persona de edad avanzada por otro individuo incluyendo, pero no limitándose a falsas pretensiones, malversación de fondos, coerción, enajenación de bienes o negación de acceso a bienes.

---

[81] Cabe destacar que, con la aprobación de la Ley Núm. 121-2019, conocida como la Carta de Derechos y la Política Pública del Gobierno a Favor de los Adultos Mayores, 8 LPRA sec. 1513, quedó derogada la Ley Núm. 121 de 12 de julio de 1986, Carta de Derechos de la Persona de Edad Avanzada en Puerto Rico. El estatuto establece que las personas de sesenta (60) años o más son reconocidas como adultos mayores. Al entrar en vigor la Ley Núm. 121-2019, supra, las "personas de edad avanzada" se les identifica como "adultos mayores".

(2) Toda persona que, conociendo sobre la incapacidad para consentir de una persona de edad avanzada o incapacitada, goce o no de una posición de confianza en relación a aquélla, y/o tenga una relación de negocios con la persona obtenga, utilice o conspire con un tercero bien sea intencionalmente, mediante engaño o intimidación para obtener o utilizar los fondos, activos, propiedad mueble o inmueble de dicha persona de edad avanzada o con impedimento, con el propósito de privarlas temporera o permanentemente de su uso, beneficio o posesión, para uso o beneficio propio o de terceros.

(b) *Penas*

(1) En los casos en que la cantidad de los fondos, activos o propiedad mueble o inmueble envueltos en la explotación financiera de la persona de edad avanzada o con impedimentos, sea de hasta $2,500.00, el ofensor incurrirá en delito menos grave.

(2) En los casos en que la cantidad de fondos, activos o propiedad mueble o inmueble envueltos en la explotación financiera de la persona de edad avanzada o con impedimento, sea de $2,501.00 en adelante, el ofensor incurrirá en delito grave.

(3) En todos los casos, el Tribunal impondrá la pena de restitución en adición a la pena establecida. (Énfasis en el original.)

**III.**

En síntesis, el Apelante en su recurso centra sus señalamientos de error en el descubrimiento de prueba y en la apreciación de la prueba que realizó el foro inferior. En particular, y como primer error, el Apelante argumenta que erró el TPI al admitir prueba impertinente e inadmisible. Como tercer y cuarto error, el Apelante impugna la apreciación de la prueba ejercida por el foro primario y si el Ministerio Público estableció su culpabilidad más allá de duda razonable. Por la estrecha relación entre estos errores, los atenderemos de forma conjunta.

Tal cual expusimos anteriormente, en el presente caso, el Ministerio Público presentó los testimonios de la señora Aponte Rodríguez y del Agente Ramos Torres. Como prueba documental, presentó el certificado de nacimiento de la señora Aponte Rodríguez; varios mensajes entre la señora Aponte Rodríguez y el señor Santiago Oyola enviados a través de *WhatsApp*; las advertencias (*Miranda Warnings*) firmadas por el señor Santiago Oyola; una orden

(*subpoena*) dirigida al Banco Popular de Puerto Rico requiriéndole información sobre el retiro de $80,000.00 contra la cuenta #785200022, realizado el 16 de junio de 2022; y el Informe de incidentes (PPR 621.2), fechado el 13 de diciembre de 2023.

Concluimos que, la evidencia antes desglosada -estipulada por la defensa- constituye prueba pertinente y admisible, dirigida a hacer más o menos probable la veracidad de los hechos que se le imputaron al señor Santiago Oyola, constitutivos del delito de explotación financiera de persona de edad avanzada. En particular, resulta pertinente evidenciar la edad de la señora Aponte Rodríguez a los fines de cualificarla como una persona de edad avanzada; la relación que sostuvo con el señor Santiago Oyola; el retiro de $80,000.00 que realizó la señora Aponte Rodríguez de su cuenta con el Banco Popular; que entregó ese dinero al señor Santiago Oyola para un presunto negocio de venta de vehículos; y que la señora Aponte Rodríguez no volvió a ver su dinero.

Establecida la pertinencia y, por tanto, la admisibilidad de la prueba de cargo, según *Pueblo v. Otero Robles*, supra, procedemos a evaluar si la evidencia del Ministerio Público fue suficiente para establecer la culpabilidad del Apelante más allá de duda razonable; si el valor y la credibilidad que otorgó a la prueba el juzgador de los hechos concuerda con la realidad fáctica o si la misma es inherentemente imposible o increíble; o si el Apelante logró demostrar que el juzgador de los hechos actuó con pasión, prejuicio, parcialidad o error manifiesto.

En el caso de marras, surge del testimonio de la señora Aponte Rodríguez, corroborado mediante su certificado de nacimiento que, nació el 26 de diciembre de 1959. Por tanto, a la fecha de los hechos, la señora Aponte Rodríguez tenía sesenta y dos (62) años. Entiéndase que, a través de dicha prueba, el Ministerio Público estableció, más allá de duda razonable, que la señora Aponte

Rodríguez es una persona de edad avanzada, (adulta mayor) elemento esencial para que se configure la violación al Artículo 127-C del Código Penal.

De igual manera, mediante el testimonio de la señora Aponte Rodríguez resumido en el tracto procesal, el Ministerio Fiscal logró evidenciar que la señora Aponte Rodríguez y el Apelante se conocieron en marzo de 2022[82] y que, durante el mes de mayo del mismo año, comenzaron una relación consensual, que duró aproximadamente cuatro (4) meses.[83] Se colige, además, que la señora Aponte Rodríguez describió su relación con el señor Santiago Oyola como una maravillosa y estupenda, "todo un sueño, el sueño de toda mujer donde tiene un hombre que la defiende, que la cuida, que le ofrece todo lo que tiene."[84]

A través de la prueba testifical y documental admitida, el Estado logró establecer, más allá de duda razonable, que con su trato y con sus promesas, el Apelante ganó la confianza de la señora Aponte Rodríguez y luego la engañó para que le entregara $80,000.00 en efectivo, bajo el supuesto de que, él aportaría $20,000.00 adicionales y duplicaría o triplicaría el monto total a beneficio de ella y de sus hijos. Lo antes, constitutivo de explotación financiera en su modalidad de falsa pretensión. Quedó también demostrado que, con sus actos, el Apelante privó de forma permanente a la señora Aponte Rodríguez de sus $80,000.00.

Tras evaluar sosegadamente el expediente, los autos originales y la transcripción de la prueba oral constatamos que, el Ministerio Público presentó prueba suficiente para demostrar, más allá de duda razonable, que el Apelante infringió el Artículo 127-C del Código Penal, *supra.* Como vimos, el testimonio de la señora

---

[82] TPO, pág. 13, línea 29.
[83] *Íd.*, pág. 19, líneas 4 y 29.
[84] *Íd.*, pág. 20, líneas 3-6.

Aponte Rodríguez coincidió con lo testificado por el Agente Ramos Torres y con la evidencia documental presentada, lo cual mereció la credibilidad del juzgador de los hechos. Cabe reiterar que, según dispuso el Alto Foro, el testimonio de un (1) solo testigo, que le merezca entera credibilidad al juzgador de hechos, es prueba suficiente para demostrar la culpabilidad de un acusado más allá de duda razonable y derrotar, así, la presunción de inocencia. *Pueblo v. De Jesús Mercado, supra*, pág. 476.

A lo anterior se añade que, la defensa tuvo amplia oportunidad de confrontar la prueba desfilada, sin lograr persuadir al foro sentenciador e impedir que el Estado probara la culpabilidad del Apelante, más allá de duda razonable. El Apelante, en su recurso, no levantó consideraciones suficientes para que justifique que esta Curia se aparte de la norma de abstención e intervenga con la apreciación de la prueba realizada. Tampoco el Apelante logró establecer que el TPI haya incurrido en pasión, prejuicio, parcialidad o error manifiesto en su apreciación de la prueba. Por todo lo antes, concluimos que el primer, tercer y cuarto error no se cometieron.

Al entender sobre el segundo señalamiento de error pendiente de discusión, no identificamos en los autos originales actos afirmativos del Apelante dirigidos a invocar, ante el foro primario, la falta de un descubrimiento de prueba a su favor, al amparo de la Regla 95 de Procedimiento Criminal, *supra.* Más bien, surge de los autos originales que, en respuesta a la *Moción al amparo de la Regla 95 de las de Procedimiento Criminal y del debido procedimiento de ley* que instó el señor Santiago Oyola, y tras varias prórrogas a esos efectos, las partes culminaron el descubrimiento de prueba. Constatamos lo anterior de la *Minuta* de la vista celebrada el 14 de mayo de 2024 ante el foro primario, la cual a esos efectos dispone "[l]a defensa informa que el descubrimiento de prueba fue

completado."[85] Observamos que, al notificar lo antes, la defensa no presentó objeción alguna e incluso, durante el juicio, estipuló la prueba de cargo admitida. De esta forma, colegimos que el Apelante no nos ha puesto en posición para revertir el dictamen apelado sobre tales bases. El segundo error señalado no fue cometido.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[85] Cabe señalar que, la referida *Minuta* obra en los autos originales.